**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x

In re:                                                    **FOR PUBLICATION**

        CELSIUS NETWORK LLC, *et al.*,          Chapter 11

                                    Case No. 22-10964 (MG)

              Post-Effective Date Debtors.
------------------------------------------------------------------------x

CELSIUS MINING LLC,

                      Plaintiff,

                                  Adv. Pro. No. 23-01202 (MG)
vs.

MAWSON INFRASTRUCTURE GROUP INC., LUNA
SQUARES LLC, and COSMOS INFRASTRUCTURE LLC,

                      Defendants.
------------------------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND**
**DENYING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION**
**AND DISMISS OR STAY ADVERSARY PROCEEDING PENDING ARBITRATION**

*A P P E A R A N C E S :*

KIRKLAND & ELLIS LLP
*Attorneys for the Post-Effective Date Debtors*
601 Lexington Avenue
New York, New York 10022
By:    Joshua A. Sussberg, Esq.

1301 Pennsylvania Avenue NW
Washington, D.C. 20004
By:    Judson Brown, Esq.
        T.J. McCarrick, Esq.
        Grace C. Brier, Esq.

300 North LaSalle Street
Chicago, Illinois 60654
By:    Patrick J. Nash Jr., Esq.
        Ross M. Kwasteniet, Esq.
        Christopher S. Koenig, Esq.
        Dan Latona, Esq.

FOX ROTHSCHILD LLP
*Attorneys for the Mawson Entities*
101 Park Avenue, 17th Floor
New York, New York 10178
By:    Michael Sweet, Esq.
          Michael R. Herz, Esq.
          Isaac M. Hoenig, Esq.

321 N. Clark Street, Suite 1600
Chicago, IL 60654
By:    Martin R. Martos, II, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Celsius Mining LLC (the "Plaintiff" or "Celsius"), on the one hand, and Mawson

Infrastructure Group Inc. ("Mawson") and several of its affiliates (collectively, the "Mawson

Entities" or the "Defendants"), on the other hand, entered into three separate contracts on

February 23, 2022[1] in connection with Celsius's cryptocurrency mining operations.[2]  These

agreements are comprised of (i) a customer equipment co-location agreement (the "Co-Location

Agreement"); (ii) a $20 million secured promissory note (the "Promissory Note"); and (iii) a

guaranty and security agreement on February 23, 2022 (the "Security Agreement" and together

with the Promissory Note, the "Loan Documents").  The agreements serve as the impetus for

Celsius's adversary complaint (the "Complaint," ECF Doc. # 1) filed on November 21, 2023

against the Mawson Entities in connection with the Mawson Entities' alleged breaches of the Co-

---

[1]      The recitals to the Co-Location Agreement specify a date of February 23, 2021 as the parties' date of entry.
However, the signature pages to the Co-Location Agreement are dated February 23, 2022.  At the hearing held on
February 21, 2024, counsel to the Mawson Entities clarified that the February 23, 2021 date in the recitals was a
typographical error and confirmed that the correct date of entry for the Co-Location Agreement is February 23,
2022.

[2]      The parties also entered into a cooperation agreement (the "Cooperation Agreement") on February 23, 2022
pursuant to which Celsius and Luna agreed to "cooperate on future projects together as strategic partners."
(Cooperation Agreement at 1.)  As the Cooperation Agreement is not subject to any of Celsius's claims asserted in
the Complaint or the Motion, this Opinion centers on the Co-Location Agreement, the Promissory Note, and the
Security Agreement.

Location Agreement and the Loan Documents.  In response, the Mawson Entities have alleged that Celsius is also in breach of the Co-Location Agreement.

The dispute before the Court centers on the arbitration clause in the Co-Location Agreement, which is governed by Delaware law, that applies to "any dispute between the parties *in connection with this Agreement*."  (Co-Location Agreement § 12.8 (emphasis added).)  It further provides that each of the parties has "irrevocably and unconditionally . . . submit[ted] any dispute of any nature between the parties *relating in any way to this Agreement* to arbitration."  (*Id.* (emphasis added).)  The term "Agreement" is defined solely to refer to the Co-Location Agreement.  (*Id.* at 1.)

The issue for purposes of this Opinion is whether the Co-Location Agreement's arbitration clause encompasses all claims Celsius has asserted in its Complaint, including those that arise solely under the Loan Documents.  While the agreements were all entered into on the same day and the Loan Documents themselves include references to each other, neither the Co-Location Agreement nor the Loan Documents incorporate the terms of the other.  The Promissory Note and the Security Agreement are separate agreements that, unlike the Co-Location Agreement, are governed by New York law.  Neither the Promissory Note nor the Security Agreement contain an arbitration clause, refers to or incorporates the arbitration clause in the Co-Location Agreement, or makes performance thereunder contingent or dependent upon performance in the Co-Location Agreement.  The sole reference in the Loan Documents to the Co-Location Agreement is a provision in the Promissory Note that earmarks the Note's proceeds to be used for the "purchase of modular data centers and transformers, and the installation and improvement thereof" in satisfaction of obligations under the Co-Location Agreement. (Promissory Note at 4.)  To the extent the parties intended for disputes under the Co-Location

Agreement and Loan Documents to be arbitrable, the language of the Co-Location Agreement's arbitration clause should have (and could have) made that clear.

The Complaint asserts 10 causes of action against the Mawson Entities. The claims include, among other things, breach of contract allegations relating to the Co-Location Agreement and, separately, the Loan Documents, as well as claims for turnover arising under section 542(b) of the Bankruptcy Code. With respect to the turnover claim relating to the Co-Location Agreement in particular, the claim seeks the return of $15.3 million in unused deposits paid by Celsius. However, as Celsius conceded at the hearing held on February 21, 2024, such turnover claim is "inextricably tied" to the breach of contract issues. Accordingly, the Court cannot resolve the turnover claims without first addressing Celsius's breach of contract claims.

For the reasons explained, the claims arising under the Co-Location Agreement must be arbitrated. This is true of both the breach of contract claims and the bankruptcy law claims that depend on the resolution of the contract claims. Meanwhile, the claims arising from the Loan Documents are not subject to arbitration and can and should be resolved by this Court. Therefore, the Court **GRANTS** the Motion with respect to Counts III, IV, V, and IX—the claims arising under the Co-Location Agreement—and **DENIES** the Motion with respect to Counts I, II, VI through VIII, and X—the claims arising under the Promissory Note and Security Agreement. Additionally, the claims arising under the Loan Documents will not be stayed pending the outcome of the arbitration.

## I.    BACKGROUND

Pending before the Court is the motion (the "Motion," ECF Doc. # 11) of Mawson, Luna Squares LLC ("Luna"), and Cosmos Infrastructure LLC ("Cosmos") seeking entry of an order (i) compelling arbitration of the claims in the adversary proceeding and (ii) dismissing the adversary

proceeding or, in the alternative, staying the adversary proceeding pending arbitration. The

Motion was filed in response to the Complaint filed by Celsius against the Defendants. In

support of the Motion, the Defendants have also filed the (i) *Memorandum of Law in Support of*

*Defendants' Motion to Compel Arbitration and Dismiss or Stay Adversary Proceeding* (the

"Supporting Memo," ECF Doc. # 11-2) and (ii) the declaration of Timothy Broadfoot, Chief

Corporate Officer of Mawson (the "Broadfoot Declaration," ECF Doc. # 11-3).

On January 30, 2024, Celsius filed an objection (the "Celsius Objection," ECF Doc. #

21), requesting that the Court deny the Motion and permit Celsius to "assert its claims in the

forum of its choosing." (Celsius Objection ¶ 53.) On February 16, 2024, the Mawson Entities

filed a reply (the "Mawson Reply," ECF Doc. # 23). The Court held a hearing on the Motion on

February 21, 2024.

### A. Celsius and the Mawson Entities

Plaintiff Celsius—a Delaware limited liability company with a principal place of business

in Hoboken, New Jersey—engages in cryptocurrency "mining." (Complaint ¶ 5.) "Mining"

generally involves the use of sophisticated hardware devices or "mining rigs" to verify new

blockchain transactions and allow for new cryptocurrency assets to enter into the market. (*Id.*)

In this instance, the Plaintiff owns and deploys mining rigs for the purpose of generating

cryptocurrency assets, engaging third-party hosting companies to provide the necessary services

to operate the mining rigs, including facilities, power, and operational management. (*Id.*)

Defendant Mawson, a publicly traded "digital infrastructure provider" that owns and

operates modular data centers in the United States, serves as the parent company of Defendants

Luna and Cosmos. (*Id.* ¶ 6.) Luna develops and operates hosting facilities designed for digital

asset mining while Cosmos owns and operates digital asset mining equipment and infrastructure.

(*Id.* ¶¶ 7, 8.)  Collectively, the Mawson Entities provide services to customers who require

hosting capacity for Bitcoin mining rigs.  (Supporting Memo at 2.)

       1.  The Co-Location Agreement

In connection with Celsius's engagement in cryptocurrency "mining," Celsius entered

into the Co-Location Agreement (Complaint, Ex. A) with Luna on February 23, 2022.  Under the

terms of the Co-Location Agreement, Luna agreed to provide hosting facilities, electrical power,

and internet access (collectively, the "Services") for the installation, maintenance, and operation

of Celsius's mining rigs for an initial term of one year as of the deployment dates identified in

Addendum A to the Agreement ("Addendum A").  (Complaint ¶ 12; Supporting Memo at 2; *see*

*also* Co-Location Agreement § 1.1; *id.*, Addendum A (indicating an initial term of one year).)  In

addition, the Co-Location Agreement also contemplated Celsius's payment of deposits to Luna in

the amounts set forth in Addendum A to "reserve[] both space in the Facility and an allocation of

power for [Celsius's] expected power consumption."  (Co-Location Agreement § 3.1.)  The

Agreement provided that any applicable deposit and power allocation would be forfeited in the

event Celsius failed to deliver equipment within 60 days of the deployment date specified in

Addendum A of the Agreement.  (Complaint ¶ 12.)

Under the terms of the Co-Location Agreement, Luna agreed to deploy a total of 30,000

Celsius mining rigs, delivered in seven monthly batches between March and July 2022 at Luna's

Midland and Sharon Facilities (as defined below), as applicable, pursuant to the schedule set

forth in Addendum A.  (Co-Location Agreement, Addendum A.)  Luna's two hosting facilities

are located at: (i) Midland – Tenth Street, Midland, PA 15059 (the "Midland Facility") and (ii)

Sharon – 200 Clark Street in the City of Sharon, Mercer County, PA (the "Sharon Facility").

(*Id.*)  As indicated in the initial Addendum A, Celsius was required to prepay, as a deposit, two

months of forecasted power costs prior to the deployment of any mining rigs for the first five batches of rig deliveries. (*Id.*) Such deposits were due 14 days prior to the commissioning of such rigs. (*Id.*)

As for the provision of power, the initial Addendum A indicated that Luna would provide the first 50 megawatts of power ("MW") at a rate of $41 per megawatt hour ("MWH"), with "the balance of the power" being at "spot price," the price that Luna paid the power supplier. (*Id.*) Luna agreed to make at least 90MW available to Celsius under the Co-Location Agreement. (*Id.*)

On July 7, 2022, Celsius and Luna revised Addendum A to the Co-Location Agreement (the "Revised Addendum A," Complaint, Ex. B), which added a third Luna hosting facility site located at 2015 George Lyons Parkway East, Sandersville, GA 31082 (the "Georgia Facility"). (Revised Addendum A at 1.) In connection with the newly added facility site, the Revised Addendum A further specified that prepaid deposits for Celsius's sixth rig delivery batch, which was to be deployed at the Georgia Facility in July 2022, were to be paid 21 days prior to the commissioning of any mining rigs and would amount to three months of expected power consumption. (*Id.*) The Revised Addendum A also indicated that Luna would "work with [Celsius] to coordinate hours of curtailment to target the desired market energy cost and avoid peak energy charges to reduce the overall Power Costs for [Celsius]" and that Luna would "implement the curtailment strategy determined by [Celsius] following coordination with Luna Squares." (*Id.*) The parties further agreed that the first 50% of power consumption by Celsius at the Midland Facility would be at $41 per MWH, with the balance being "at spot price." (*Id.* at 2.)

Notably, section 12.8 of the Co-Location Agreement establishes Delaware as the governing law and provides for the arbitration of "any dispute between the parties in connection with [the Co-Location Agreement]." (Co-Location Agreement § 12.8.) The provision states, in relevant part, the following:

> 12.8 Governing Law and Venue.
>
> This Agreement and performance of the parties to this Agreement shall be construed and governed according to the internal substantive and procedural laws of the State of Delaware applicable to contracts made and to be fully performed in such state (except any laws of that state that would render such choice of law ineffective). *If there is any dispute between the parties in connection with this Agreement, including any question regarding its existence, validity or termination, unless amicably resolved by the parties, such dispute shall be finally settled by arbitration in accordance with the terms set forth hereunder.* The parties agree that any such dispute shall be submitted exclusively to arbitration in accordance with the American Arbitration Association (AAA) Rules (the "Rules") in effect at the time of submission for arbitration which Rules are deemed to be incorporated by reference into this clause. . . . EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY (A) *SUBMITS ANY DISPUTE OF ANY NATURE BETWEEN THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT TO ARBITRATION AS PROVIDED FOR ABOVE* . . . .

(*Id.* (emphasis added).)

2. <u>The Promissory Note and Security Agreement</u>

Concurrent with the execution of the Co-Location Agreement, Celsius loaned Luna $20 million to "purchase and install modular data centers and transformers to assist Luna in satisfying its obligations under [the Co-Location Agreement]." (Complaint ¶ 17; *see also* Complaint, Ex. I ("Celsius Mining owns and has access to ASIC mining units, and is able to offer debt and equity financing for the development of digital asset infrastructure.").) On February 23, 2022, Luna executed and delivered a Promissory Note (Complaint, Ex. C). With a maturity date of August 23, 2023 (the "Maturity Date"), the Promissory Note required Luna to pay "the entire unpaid Principal Balance, together with all accrued but unpaid interest, including

8

default interest, if any" on the Maturity Date.  (Promissory Note at 1.)  Specifically, the

Promissory Note provided that, beginning six months after the closing date, Luna was to make

quarterly amortization payments equal to 15% of the original principal loan amount.  (*Id.*)

To secure the loan under the Promissory Note, Celsius and the Mawson Entities executed

the Security Agreement (Complaint, Ex. D) on February 23, 2022.  Under the terms of the

Security Agreement, Luna granted Celsius a continuing security in (A) Luna's "right in, title and

interest to and under (i) all of the personal property, Equipment, and Fixtures purchased with the

proceeds of the [Promissory] Note, and (ii) to the extent not included in (i), 50 modular data

centers and 50 transformers located at the [Midland] Facility or the Sharon Facility for purposes

of hosting Bitcoin miners" (collectively, the "Luna Collateral") and (B) Cosmos's "right in, title

and interest to and under, the Miners," comprised of the temporary and permanent collateral

miners listed on Exhibits B-1 and B-2 to the Security Agreement, respectively (collectively, the

"Cosmos Collateral" and, together with the Luna Collateral, the "Collateral").  (Security

Agreement, §§ 2.1(a)–(b).)  Additionally, Mawson served as guarantor, guaranteeing the "due

and punctual payment in full of all Note Obligations."  (*Id.* § 7.1.)

With respect to the Collateral, Luna and Cosmos represented and warranted on a joint

and several basis that each possessed "good and valid rights in or the power to transfer the

Collateral and title to the Collateral . . . free and clear of all Liens, and has full organizational

power and authority to grant [Celsius] the Security Interest in such Collateral."  (*Id.* § 3.1.)

Moreover, Luna and Cosmos agreed that neither would "sell, lease or otherwise dispose of the

Collateral owned by it except for dispositions permitted pursuant to Section 5(c) of the

[Promissory] Note and subject to compliance with Section 2(b) of the [Promissory] Note."  (*Id.* §

4.1(d).)

Unlike the Co-Location Agreement, the Promissory Note and Security Agreement do not contain an arbitration clause and provide that New York law will be the governing law. (*See* Promissory Note at 11 (specifying New York law as governing law); Security Agreement § 8.14 (indicating that sections 16, 17, and 18 of the Promissory Note, which, among other things, relate to governing law, are incorporated by reference *mutatis mutandis*).)

3.   The Cooperation Agreement

In conjunction with the Co-Location Agreement and Loan Documents, Celsius and Mawson also entered into a cooperation agreement (Complaint, Ex. I). Under the terms of the Cooperation Agreement, Celsius and Luna agreed to "cooperate on future projects together as strategic partners." (*Id.*) Additionally, to the extent no material disputes between the parties or material defaults under the Co-Location Agreement and the Loan Documents exist, both Celsius and Luna agreed to "actively seek out opportunities of mutual benefit to the parties, and if any are identified, to make good faith efforts to collaborate with the other party on such opportunity." (*Id.*) Additionally, Luna was also required to offer Celsius a "right of first refusal" over third parties with respect to any hosting services or power capacity for the hosting of digital asset mining operations. (*Id.*)

**B. The Rule 2004 Examination Request**

On July 25, 2023, the Debtors filed the *Ex Parte Motion for an Order Under Federal Rules of Bankruptcy Procedure 2004 and 9016 for Subpoenas Examination of, and Production of Documents From, Mawson Infrastructure Group Inc., Luna Squares LLC, and Cosmos Infrastructure LLC* (the "Rule 2004 Motion," Case No. 22-10964, ECF Doc. # 3088). The Debtors sought to examine, among other things, materials related to the ownership and titling of

the Luna Collateral and the disposition of Celsius's deposits under the Co-Location Agreement. (Complaint ¶ 50.)

On July 26, 2023, the Court granted the Debtors' Rule 2004 Motion, and subsequently approved a Rule 30(b)(6) deposition of Timothy Broadfoot, the corporate representative of the Mawson Entities. (*Id.* ¶ 51; *see also* Case No. 22-10964, ECF Doc. # 3091.) The Debtors conducted a Rule 30(b)(6) deposition of Mr. Broadfoot on August 31 and September 1, 2023, inquiring into the "status and disposition of the [Luna] Collateral that Luna was purported to have purchased with the $20 million loan from Celsius." (*Id.* ¶ 52.)

### C. The Adversary Complaint

On November 21, 2023, Celsius commenced an adversary proceeding against the Mawson Entities in connection with the Mawson Entities' alleged breaches of the Co-Location Agreement and the Loan Documents. The alleged breaches along with other allegations and the asserted claims are each addressed in turn.

### 1. The Alleged Breaches

Celsius alleges that Luna failed to meet its obligations under the Co-Location Agreement in two ways: (i) Luna never satisfied its deployment obligations of Celsius's mining rigs and (ii) Luna failed to offset unpaid Celsius invoices against Celsius's prepaid deposits. (Complaint ¶¶ 24–25, 32, 44.) With respect to Luna's deployment obligations, Celsius indicates that, by the end of April 2022, Luna neither provided the required Services nor deployed approximately 4,500 mining rigs that Celsius delivered, with the deployment backlog ballooning to over 15,000 mining rigs by May 2023. (*Id.* ¶ 24.) A summary of the alleged deployment deficiencies is set forth as follows:

| Date | Addendum A Expected Cumulative Rigs Deployed | Actual Cumulative Rigs Hashing | Deficit of Rigs Hashing vs Delivered | Deficit of Rigs Hashing vs Addendum A |
|---|---|---|---|---|
| 4/30/2022 | 6,000 | 901 | -4,499 | -5,099 |
| 5/31/2022 | 12,000 | 3,504 | -9,996 | -8,496 |
| 6/30/2022 | 21,180 | 8,653 | -4,847 | -12,527 |
| 6/30/2022 (Sharon) | 30,000 | 8,653 | -4,847 | -21,347 |
| 7/31/2022 | 30,000 | 9,488 | -12,652 | -20,512 |
| 8/31/2022 | 30,000 | 15,371 | -6,769 | -14,629 |
| 9/30/2022 | 30,000 | 9,150 | -10,596 | -20,850 |
| 10/31/2022 | 30,000 | 9,092 | -10,654 | -20,908 |
| 11/30/2022 | 30,000 | 8,460 | -11,286 | -21,540 |
| 12/31/2022 | 30,000 | 8,202 | -11,544 | -21,798 |
| 1/31/2023 | 30,000 | 9,467 | -10,279 | -20,533 |
| 2/28/2023 | 30,000 | 9,450 | -10,296 | -20,550 |
| 3/31/2023 | 30,000 | 9,417 | -10,329 | -20,583 |
| 4/30/2023 | 30,000 | 10,276 | -9,470 | -19,724 |
| 5/31/2023 | 30,000 | 4,089 | -15,657 | -25,911 |
| 6/30/2023 | 30,000 | 16,651 | -3,095 | -13,349 |

(*Id.* ¶ 25.)  As set forth in the Revised Addendum A, Luna was obligated to offer hosting

capacity for the deployment of 30,000 Celsius mining rigs.  (Revised Addendum A at 1.)

Celsius indicates that it suffered lost revenue for "[e]ach day that Luna failed to deploy Celsius's

mining rigs in accordance with the Co-Location Agreement."  (Complaint ¶ 31.)  Making matters

worse, Celsius alleges that, as Luna failed to satisfy its obligations to Celsius, the "Mawson

Entities continued to deploy thousands of their own mining rights for their own economic

benefit."  (*Id.* ¶ 29.)

Celsius alleges that Luna was also in breach of the Co-Location Agreement for its refusal

to apply Celsius's $15.3 million in prepaid deposits to an invoice Luna sent to Celsius on July

13, 2023.  (*Id.* ¶¶ 43–44.)  Pursuant to the Co-Location Agreement and the Revised Addendum

A, Celsius indicates that it prepaid six deposits to Luna between April 4, 2022 and July 1, 2022

totaling approximately $15.3 million.  (*Id.* ¶ 16.)  The paid invoices are as follows:

| Date | Invoice Number | Memo Line | Amount |
|------|----------------|-----------|--------|
| 3/31/2022 | INV275 | Celsius Long Term Deposit - March | $541,952 |
| 4/13/2022 | INV292 | Celsius Long Term Deposit – April 2022 | $1,083,904 |
| 4/21/2022 | INV293 | Celsius Long Term Deposit – May 2022 | $1,625,856 |
| 5/17/2022 | INV312 | Celsius Long Term Deposit – June 2022 | $3,522,688 |
| 6/17/2022 | INV331 | Celsius Additional Power Deposit – Mar – June 2022 | $4,931,322 |
| 7/5/2022 | INV335 | Celsius Power Deposit – GA Site – July 2022 | $3,622,712.10 |

(*Id.* ¶ 33.)

On July 13, 2023, Luna sent Celsius an invoice for amounts due under the Co-Location Agreement. (*Id.* ¶ 42.)  In response, Celsius requested that Luna apply its prepaid deposits to offset the amounts due in accordance with section 3.1 of the Co-Location Agreement, indicating further that it would not renew the Co-Location Agreement. (*Id.* ¶ 43.)  Counsel to the Mawson Entities refused on grounds that Celsius had forfeited all of its deposits by "allegedly failing to deliver certain mining rigs within sixty days of their specified deployment date." (*Id.* ¶ 44.)

Celsius indicates that it was in full compliance with its obligations under the Co-Location Agreement, including the delivery schedule, prior to July 1, 2022. (*Id.* ¶ 34.)  Rather, Celsius did not ultimately deliver the approximately 9,000 mining rigs in June 2022 despite paying the final deposit of $3,622,712.10 to Luna on July 5, 2022 in accordance with the directive of Luna employees. (*Id.* ¶ 35 ("At this time . . . Luna already had approximately 4,800 Celsius mining rigs in its possession that it had failed to deploy, and Luna employees had instructed Celsius not to deliver additional rigs.").)

In addition to the Co-Location Agreement, Celsius alleges that Luna is in breach of the Promissory Note for its failure to pay the outstanding principal loan amount plus interest upon maturity. (*Id.* ¶¶ 47, 48.)  As noted, the Promissory Note matured on August 23, 2023. (Promissory Note at 1.)  Celsius indicates that, as of the date of the Complaint, $8.24 million plus interest remains outstanding. (Complaint ¶ 48; Celsius Objection ¶ 15.)

### 2.   Other Allegations

Celsius further alleges that the Mawson Entities improperly titled the Luna Collateral and the "rights and title to the [Luna] Collateral were instead acquired by Cosmos and Mawson." (*Id.* ¶ 54.)  Specifically, Celsius states that the Mawson Entities "intentionally breached their representations in the Loan Documents and failed to acquire the Collateral into Luna, instead acquiring it into Mawson and Cosmos."  (Complaint ¶ 53.)

Moreover, based on the Rule 30(b)(6) deposition of Mr. Broadfoot, Celsius also asserts that the Mawson Entities lack almost any distinct corporate functions and that Luna was an "undercapitalized entity" as of the date of the Complaint.  (*Id.* ¶ 57.)

### 3.   Claims Asserted and Relief Requested

Against the backdrop of the foregoing allegations, Celsius asserts 10 causes of action against the Mawson Entities.  Counts I, II, VI through VIII, and X relate to the Loan Documents while Counts III through V and IX relate to the Co-Location Agreement.

With respect to the Loan Documents, Celsius seeks declaratory judgment of Celsius's right to immediate and full payment of the outstanding principal in the approximate amount of $8.24 million plus interest owed by the Mawson Entities to Celsius under the Loan Documents (Count I) and turnover of the same pursuant to section 542(b) of the Bankruptcy Code (Count II). (*Id.* ¶¶ 59, 66, 75; Celsius Objection ¶ 16.)  Moreover, Celsius alleges that Luna breached various terms of the Promissory Note and Security Agreement when it failed to acquire good right, title, and ownership to the Luna Collateral purchased with proceeds of the Promissory Note, injuring Celsius's business and resulting in damages in an amount to be proven at trial (Count VI).  (Complaint ¶¶ 107–09.)

With respect to the Co-Location Agreement, Celsius seeks the return of the entire $15.3 million in unused deposit amounts paid to Luna under the Co-Location Agreement on grounds of turnover pursuant to section 542(b) of the Bankruptcy Code (Count III), breach of contract (Count IV), and breach of the implied covenant of good faith and fair dealing in connection with Luna's refusal to apply the prepaid deposits to outstanding balance amounts owed (Count V). (*Id.* ¶¶ 84, 91, 98.)  In addition, Celsius asserts that Luna breached the Co-Location Agreement when it failed to provide the Services and to deploy Celsius's mining rigs in accordance with the schedule set forth in the Revised Addendum A, injuring Celsius's business (Count IX).  (*Id.* ¶¶ 126–28.)  Accordingly, Celsius seeks payment of damages in an amount to be proven at trial in connection with the alleged breaches of the Co-Location Agreement and the implied covenant of good faith and fair dealing under the same.  (*Id.* ¶¶ 91, 98, 128, 142(g).)

Moreover, in connection with the alleged improper titling of the Luna Collateral, Celsius seeks the avoidance of the transfers made to the Mawson Entities under the Promissory Note and recovery in the amount of the transfers.  (*Id.* ¶ 142(f).)  Specifically, Celsius alleges that Luna transferred the proceeds of the Promissory Note to Mawson or Cosmos or arranged for the Luna Collateral to be owned, possessed, and titled by Mason and Cosmos with "actual intent to hinder, delay, or defraud Celsius."  (*Id.* ¶ 113.)  Accordingly, Celsius asserts a count for actual fraudulent transfer under sections 273(a)(1) and 276 of New York's Debtor and Creditor Law (Count VII).  (*Id.* ¶ 114.)  As Celsius also believes that Luna was insolvent or became insolvent at the time of transfer without receiving value or fair consideration in return, it also asserts a count for constructive fraudulent transfer under sections 273(a)(2) and 276 of New York's Debtor and Creditor Law (Count VIII).  (*Id.* ¶¶ 118–21.)

Finally, Celsius asserts a claim for common law fraud relating to the Mawson Entities' alleged misrepresentations to Celsius regarding the acquisition and proper titling and ownership of the collateral purchased with the proceeds of the Promissory Note (Count X). Celsius alleges that Mawson's Chief Executive Officer, James Manning, made material fraudulent misrepresentations with "consciousness of or reckless disregard for their falsity" concerning (i) Luna's acquisition of the Luna Collateral and (ii) Celsius's perfection of its security interests. (*Id.* ¶¶ 134–36.) Celsius relied on such misrepresentations, which induced Celsius to transfer the $20 million loan amount to Luna, to its detriment, and seeks recovery of damages in an amount to be proven at trial. (*Id.* ¶¶ 140–41, 142(h).)

As for additional relief, Celsius also seeks the awarding of costs, including reasonable attorneys' fees, pre-judgment and post-judgment interest, and a declaration that Mason and Cosmos, as "alter egos of Luna," are jointly and severally liable for all damages alleged. (*Id.* ¶ 142(b), (i), and (j).)

### D. The Motion

The Mawson Entities seek entry of an order compelling Celsius to (i) arbitrate all claims asserted in the Complaint and (ii) dismiss the adversary proceeding or, in the alternative, to stay the matter pending the outcome of any arbitration proceeding.[3] (Supporting Memo at 24.) Indeed, they believe that no conflict exists between the Bankruptcy Code and the Federal Arbitration Act, 9 U.S.C. §§ 1-14 ("FAA"), and that the FAA mandates arbitration in this instance. (*Id.* at 8–9.)

---

[3] The Defendants further submit that they cannot answer the Complaint or file motions pursuant to Rule 12 of the Federal Rules of Civil Procedure "without material risk of waiving their right to arbitrate." (Supporting Memo at 23.) Accordingly, they request that the Court decide the Motion and "set a reasonable deadline for responsive pleadings if needed thereafter." (*Id.*) This Opinion and Order requires that Defendants file their answers to Counts I, II, VI through VIII, and X of the Complaint within thirty (30) days after the date of this Opinion.

In support of the relief sought, the Mawson Entities argue that arbitration of all claims is appropriate as the Co-Location Agreement arbitration clause is valid, enforceable, and broad enough to encompass all claims asserted in the adversary proceeding as well as the Mawson Entities' corresponding defenses and counterclaims. (*Id.* at 8, 10–14.) They assert that nothing in the Bankruptcy Code requires a different result, as Celsius had indisputably agreed to arbitrate and the parties had delegated questions of arbitrability to the arbitrator via the incorporation of the American Arbitration Association Rules in the arbitration clause. (*Id.* at 10–14.)

Additionally, the Mawson Entities argue that all the claims asserted in the Complaint, including the claims for turnover, center on a contractual dispute over the Co-Location Agreement, and are therefore, non-core and subject to arbitration. (*Id.* at 9, 15.) With respect to Counts II and III in particular, which relate to turnover, the Defendants adopt the position that such claims are "faux 'turnover' claims" as the amounts owed are in dispute and Celsius is merely seeking to liquidate its breach of contract claim. (*Id.* at 16, 18.) With respect to Counts IV through X—which allege breach of contract, breach of the covenant of good faith and fair dealing, state law fraudulent transfer, and fraud claims—the Defendants argue are state law claims and non-core. (*Id.* at 18–19.)

Additionally, even if some of the claims are not arbitrable, the Mawson Entities assert that their defenses and counterclaims involve the same set of factual and legal questions. (*Id.* at 9, 20.) Accordingly, as bifurcating the claims between this Court and arbitration would risk inconsistent adjudication, the Mawson Entities argue that dismissal or stay of the adversary proceeding is appropriate. (*Id.* at 9, 20–22.) This is particularly so, Defendants argue, given the alleged "interrelated nature of the agreements and related connectedness of the causes of action." (*Id.* at 22.) The Mawson Entities assert that the Co-Location Agreement and Promissory Note,

which were executed together, were part of a "cohesive mechanism" to facilitate provision of the Bitcoin mining hosting services by them to Celsius. (*Id.*) Their position is that resolution of claims relating to the Promissory Note necessarily requires a determination of Celsius's conduct under the Co-Location Agreement. (*Id.*)

As part of its Motion, the Mawson Entities also assert their own allegations against Celsius, arguing that Celsius itself was in breach of the Co-Location Agreement for its failure to pay Luna's invoices in June and July 2022 and for the services provided during December 2022 and June 2023 through August 2023. (*Id.* at 3–4.) In total, they indicate that Celsius failed to pay $6,957,226.91 plus interest on pre-petition and post-petition invoices for services Luna provided under the Co-Location Agreement. (*Id.* at 4.) They assert that it was only after Celsius failed to pay such invoices that it sought a "temporary pause" on its active miners to avoid incurring additional service costs, as well as a pause on the deployment of any new miners. (*Id.* at 4–5.) Accordingly, they argue that notwithstanding Celsius's assertions, it was Celsius's breaches of the Co-Location Agreement that prevented Luna from running Celsius rigs or adding new rigs. (*Id.* at 4.)

In addition to the foregoing breaches, the Mawson Entities also allege that Celsius failed to deliver the 30,000 rigs it committed to when it refused to deliver the remaining 10,000 mining rigs in May 2023 to Luna's Midland Facility. (*Id.* at 6.) The Georgia Facility was sold in October 2022 to a third party and the Mawson Entities argue that they would not have done so absent Celsius's breach of the Co-Location Agreement. (*Id.* at 5.) Celsius had elected to prematurely exit the Georgia Facility and move nearly 9,000 mining rigs to the Midland Facility to allegedly save on state taxes. (*Id.* at 6.) Collectively, the Mawson Entities argue that Celsius's breaches, pause request, premature exit from Georgia, and refusal to deliver nearly

10,000 mining rigs resulted in damages to the Mawson Entities that reduce Luna's obligations to make Promissory Note payments or excuse those payments altogether.  (*Id.* at 4–6; *see also id.* at 14 (stating that these breaches "stand as a legal defense (or at least a set off) against any claim for payment under the Promissory Note")).)

### E.  The Debtor's Opposition

Celsius opposes the relief sought in the Motion on several grounds, including that the Co-Location Agreement's arbitration clause does not encompass claims arising under the Loan Documents and that such claims are "core" claims and non-arbitrable.  Each is discussed in turn.

1.  The Co-Location Arbitration Provision Cannot Apply to Claims Arising Under the Loan Documents

Celsius rejects the "single package" theory on grounds that the Co-Location Agreement, the Promissory Note, and the Security Agreement are "three distinct agreements."  (Celsius Objection ¶ 1.)  As such, it asserts that there is no basis for the Co-Location Agreement's arbitration clause to apply to all claims.  (*Id.* ¶¶ 3–4.)  Accordingly, Celsius believes that Counts I, II, VI through VIII, and X are not arbitrable as they do not relate to the Co-Location Agreement.  (*Id.* ¶¶ 18, 25.)

In support of the notion that the agreements are distinct, Celsius points to the language of the agreements themselves.  First, Celsius notes that the Co-Location Agreement established Delaware law as the governing law while the Promissory Note and Security Agreement established New York law as the governing law, suggesting that the parties intended for the agreements to be governed by different legal frameworks.  (*Id.* ¶¶ 8–10, 27.)  Additionally, neither the Promissory Note nor the Security Agreement contain arbitration clauses, reference the Co-Location Agreement's arbitration clause, or condition performance under any other agreement.  (*Id.* ¶¶ 9–10, 27.)  This is notwithstanding the Security Agreement's incorporation of

the governing law provision of the Promissory Note by reference, suggesting that parties knew how to incorporate by reference provisions between these contemporaneous agreements but chose not to. (*Id.* ¶ 27.) Given this, Celsius asserts that it did not agree to arbitrate claims relating to the Loan Documents and argues that the Co-Location Agreement's arbitration clause is not broad enough to encompass claims relating to the Loan Documents.

Celsius also addresses the nature of the claims themselves as further support for the idea that the agreements are distinct. It notes that claims arising under the Loan Documents do not relate to or arise in connection with the Co-Location Agreement, as resolution of the former do not require consideration of the parties' separate rights and obligations under the latter. (*Id.* ¶¶ 28, 33–34.) Additionally, Celsius rejects the Mawson Entities' assertion that they are entitled to setoff, as a court must determine arbitrability on a claim-by-claim basis. (*Id.* ¶ 35.)

### 2.   The Court Should Determine Arbitrability

Celsius argues that questions of arbitrability are appropriately decided by this Court. (*Id.* ¶ 36.) Absent clear and unmistakable evidence that the parties intended for questions of arbitrability to be decided by an arbitrator, Celsius states that this Court should adjudicate questions of arbitrability as to Celsius's claims. (*Id.* ¶¶ 36, 39.)

### 3.   Celsius's Turnover Claims and Breach of Contract Claims Should be Adjudicated by this Court

With respect to Counts II and III, Celsius's turnover claims, Celsius argues that such claims should not be subject to arbitration as they are "core" claims that are distinct and arise only under the Bankruptcy Code. (*Id.* ¶¶ 40–44.) Additionally, there is no dispute as to what is owed. (*Id.*)

As for Counts IV and IX (which relate to breach of contract) and Count V (which relates to the breach of the implied covenant of good faith), Celsius concedes such claims fall within the

scope of the Co-Location Agreement's arbitration clause.  (*Id.* ¶ 45.)  However, it argues that

these claims are "core" as they represent "important recoveries for the estate" in the approximate

amount of $15.3 million plus additional amounts in lost revenue.  (*Id.* ¶ 48.)  In light of such,

Celsius argues that such claims should be adjudicated by this Court.  (*Id.*)  Notably, Celsius

characterizes Count IX as a mixed pre- and post-petition breach of contract claim and Counts IV

and V as post-petition claims for breach of contract and breach of the implied covenant of good

faith and fair dealing, respectively.  (*Id.*)

### 4.  Balance of Claims Should Not Be Stayed Pending Arbitration

Lastly, Celsius argues that, in the event the Court determines that the claims relating to

the Co-Location Agreement are indeed arbitrable, there is no basis to stay the remaining claims

relating to the Loan Documents pending arbitration.  (*Id.* ¶ 49.)  As noted above, Celsius does

not believe that resolution of the claims arising under the Co-Location Agreement has any

bearing on the resolution of claims arising under the Loan Documents.  (*Id.* ¶ 52.)  Given this,

Celsius does not believe that staying the balance of the non-arbitrable claims arising under the

Loan Documents is necessary.  (*Id.*)

## I.    **LEGAL STANDARD**

### A.  **Arbitration In General**

The Federal Arbitration Act establishes a federal policy that favors the enforceability of

arbitration clauses, "requir[ing] a federal court to enforce arbitration agreements and to stay

litigation that contravenes them."  *Burns v. New York Life Ins. Co.*, 202 F.3d 616, 620 (2d Cir.

2000) (citation omitted); *see also* 9 U.S.C. §§ 2 & 3.  The statute represents a "congressional

declaration of a liberal federal policy favoring arbitration agreements," and "any doubts

concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Kittay v.*

*Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 197 (Bankr. S.D.N.Y. 2002)

("*Hagerstown*") (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24

(1983)).

However, "[l]ike any statutory directive, the [FAA's] mandate may be overridden by a

contrary congressional command." *Id.* at 198 (quoting *Shearson/American Express, Inc. v.

McMahon*, 482 U.S. 220, 226 (1987)).  Accordingly, the "burden is on the party opposing

arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the

statutory rights at issue." *McMahon*, 482 U.S. at 227.  In making such a determination, courts

will deduce intent from the statute's text or legislative history or from an "inherent conflict

between arbitration and the statute's underlying purposes." *Id.*

Accordingly, a bankruptcy court faced with a motion to compel arbitration must apply the

following four-part test:

> [F]irst, it must determine whether the parties agree to arbitrate; second, it
> must determine the scope of that agreement; third, if federal statutory claims
> are asserted, it must consider whether Congress intended those claims to be
> nonarbitrable; and fourth, if the court concludes that some, but not all, of
> the claims in the case are arbitrable, it must then decide whether to stay the
> balance of the proceedings pending arbitration.

*Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 789

(Bankr. S.D.N.Y. 2008) ("*Bethlehem Steel*") (citation omitted).

### B.  Whether the Parties Agreed to Arbitration

As a threshold matter, courts must first address whether the parties agreed to arbitration.

*See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[T]he

first task of a court asked to compel arbitration of a dispute is to determine whether the parties

agreed to arbitrate that dispute.").  While the FAA favors arbitration, as noted above, it "does not

require the parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of*

*Trs.*, 489 U.S. 468, 478 (1989).  In making such a determination, courts will look to the plain

language of the arbitration clause.  *See, e.g.*, *In re MF Global Holdings Ltd.*, 571 B.R. 80, 91–92

(Bankr. S.D.N.Y. 2017) ("*MF Global*") (concluding that a plain text of the arbitration clause

indicated that the parties agreed to arbitration).

### C.  Scope of the Arbitration Clause

Next, a court must determine the scope of the arbitration clause, and specifically whether

such clause is "narrow" or "broad."  *Bethlehem Steel*, 390 B.R. at 789–90.  A clause is "broad" if

it purports to "refer all disputes arising out of a contract to arbitration" and "narrow" if it

"limit[s] arbitration to specific types of disputes.  *Id.* at 790 (quoting *Collins & Aikman Prods.*

*Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 21 (2d Cir. 1995)).

In the event a clause is "broad," arbitrability will be presumed.  *MF Global*, 571 B.R. at

92; *see also Bethlehem Steel*, 390 B.R. at 790 ("If a court concludes that a clause is a broad one,

then it will order arbitration and any subsequent construction of the contract and of the parties'

rights and obligations under it are within the jurisdiction of the arbitrator.") (citation omitted).

Again, "any doubts concerning the scope of arbitrable issues should be resolved in favor of

arbitration."  *Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 425 B.R. 78,

86–87 (Bankr. S.D.N.Y. 2010) (citations omitted).

### D.  Whether Congress Intended to Exclude This Dispute from Arbitration

The third inquiry requires consideration of "Congress's policy in favor of arbitration as

weighed against the important federal interests embodied in the Bankruptcy Code."  *Cardali v.*

*Gentile (In re Cardali)*, No. 10-3531 (SHL), 2010 WL 4791801, at *7 (Bankr. S.D.N.Y. Nov. 18,

2010).  Even if the claims for which a party seeks to compel arbitration are covered by a broad

arbitration clause, a court retains discretion to deny arbitration of such claims. *Bethlehem Steel*, 390 B.R. at 793–94.

In resolution of this prong, courts have looked to whether a matter is "core" or "non-core." *See Hagerstown*, 277 B.R. at 200. Generally, core proceedings are matters "arising under" the Bankruptcy Code or "arising in" bankruptcy cases while non-core proceedings are merely "related to" bankruptcy cases. *Cardali*, 2010 WL 4791801, at *7 (citation omitted). Thus, core claims include those that "clearly invoke substantive rights created by federal bankruptcy law" as well as "proceedings that, by their nature, could only arise in the context of a bankruptcy case." *MBNA America Bank, N.A. v. Hill*, 436 F.3d 104, 108–09 (2d Cir. 2006). In contrast, a non-core matter is one that is "unlikely to present a conflict sufficient to override by implication the presumption in favor of arbitration." *Hagerstown*, 277 B.R. at 201 (citing *U.S. Lines, Inc. v. Am. Steamship Owners Mut. Prot. and Indem. Assoc. (In re U.S. Lines, Inc.)*, 197 F.3d 631, 640 (2d Cir. 1999)).

If a claim is non-core, a court generally lacks discretion and must refer the claim to arbitration. *MF Global*, 571 B.R. at 93. Even if a claim is core, however, a court "must still carefully determine whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing the arbitration clause," and the "arbitration clause should be enforced unless doing so would seriously jeopardize the objectives of the Code." *Hagerstown*, 277 B.R. at 200–01 (internal quotation marks and citations omitted); *see also Bethlehem Steel*, 390 B.R. at 794 ("In core proceedings, a further determination is needed to show that arbitrating the dispute would severely conflict with relevant provisions of the Bankruptcy Code.").

Therefore, the "second step asks whether the underlying dispute concerns rights created under the Bankruptcy Code or non-Bankruptcy Code issues derivative of the debtor's pre-

petition business activities.  In the former situation, the bankruptcy court has discretion to refuse

arbitration, but in the latter it does not."  *Hagerstown*, 277 B.R. at 202 (internal citation omitted).

In order to determine whether a claim is core or noncore, the court considers that:

> A trustee in bankruptcy wears two hats.  First, he stands in the shoes of the
> debtor, and may bring any suit that the debtor could have brought before
> bankruptcy.  When the trustee sues as statutory successor to the debtor, his
> rights are limited to the same extent as the debtor's under applicable
> nonbankruptcy law.  If the debtor agreed in a pre-petition contract to
> arbitrate a dispute, the trustee, suing as successor to the debtor, is likewise
> bound by the arbitration clause.  Second, under section 544, the trustee also
> stands in the "overshoes" of the creditors. . . .  Section 544(b) . . . puts the
> trustee in the creditors' shoes, and allows him to assert claims that only they
> could assert outside of bankruptcy.

*Id.* at 206–07 (internal citations omitted).

Other courts distinguish between two types of "core" claims—procedurally core claims

and substantively core claims—with the latter usually being non-arbitrable.  Procedurally core

claims are "garden variety pre-petition contract disputes dubbed core because of how the dispute

arises or gets resolved."  *Hagerstown*, 277 B.R. at 203 (finding a breach of contract claim to be

procedurally core).  With respect to such claims, "arbitration . . . rarely conflicts with any policy

of the Bankruptcy Code unless the resolution of the dispute fundamentally and directly affects a

core bankruptcy function."  *Id.* (internal citation omitted).

Conversely, claims that are "not based on the parties' pre-petition relationship, and

involve rights created under the Bankruptcy Code" are core for substantive reasons and are

usually not arbitrable.  *Hagerstown*, 277 B.R. at 203.  More likely than not, arbitration of such

claims "[would] conflict with the policy of the Bankruptcy Code that created the right in

dispute."  *Id.*  Accordingly, "[t]he bankruptcy court enjoys much greater discretion to refuse to

compel the arbitration of this type of dispute."  *Id.*

Notwithstanding the foregoing, the focus remains on the ultimate impact on a debtor's

estate.  Indeed, other courts have found that where the action has a significant impact on the

administration of the estate, without distinguishing between a procedurally or substantively core

claim, a claim can be "core."  *See, e.g., U.S. Lines, Inc.*, 197 F.3d at 637–38 (finding that

contract claims were core not simply because they involved property of the estate but because

the indemnity insurance contract underlying such claims was likely the debtor's "most important

asset" and resolution of the coverage disputes would have a "significant impact on the

administration of the estate" and creditor recoveries).

### E.  Stay of the Proceeding Pending the Outcome of Arbitration

In the event some but not all claims are arbitrable, a court must address whether to stay

the balance of the claims.  *Hagerstown*, 277 B.R. at 199.  Section 3 of the FAA generally

requires a court to stay a proceeding pending arbitration where a court has determined that the

issue involved is "referable to arbitration under . . . an agreement."  9 U.S.C. § 3.  A court's

"power to grant a stay flows from its inherent power to control its docket . . . and the decision is

committed to the court's discretion."  *Hagerstown*, 277 B.R. at 199 (citation omitted).

On the whole, a "broad stay order should be issued where 'the arbitrable claims

predominate the lawsuit and the non-arbitrable claims are of questionable merit.'"  *In re S.W.*

*Bach & Co.*, 425 B.R. at 98 (quoting *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856

(2d Cir. 1987)).  In addition, such orders are also appropriate where a stay will "promote judicial

economy, avoidance of confusion and possible inconsistent results without working an undue

hardship or prejudice against the plaintiff."  *Hagerstown*, 277 B.R. at 199 (quoting *Acquaire v.*

*Canada Dry Bottling*, 906 F. Supp. 819, 838 (E.D.N.Y. 1995) (internal quotation marks

omitted)).  Courts have found that a broad stay is appropriate "where there were common

questions of fact among the non-arbitrable and arbitrable claims, or when the arbitration was likely to dispose of issues common to the claims of the arbitrating and non-arbitrating defendants." *In re S.W. Bach & Co.*, 425 B.R. at 98; *see also Moore v. Interacciones Global, Inc.*, No. 94 Civ. 4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995).

## II.    **DISCUSSION**

### A.   **The Co-Location Agreement's Arbitration Provision Applies Only to Claims Arising Thereunder**

The plain language of section 12.8 of the Co-Location Agreement, which sets forth the arbitration provision in question, indicates that it relates only to claims arising under the Co-Location Agreement and does not encompass claims arising under the Loan Documents.  Section 12.8 states that "[i]f there is any dispute between the parties in connection *with this Agreement*, including any question regarding its existence, validity or termination, unless amicably resolved by the parties, such dispute shall be finally settled by arbitration in accordance with the terms set forth hereunder."  (Co-Location Agreement § 12.8 (emphasis added).)  It further indicates that each of the parties has "irrevocably and unconditionally . . . submit[ted] any dispute of any nature between the parties *relating in any way to this Agreement* to arbitration as provided for above."  (*Id.* (emphasis added).)  The term "Agreement" is defined to refer solely to the Co-Location Agreement.  (*See id.* at 1.)

The Co-Location Agreement is governed by Delaware law.  Under Delaware law, a court must generally look to the "plain language of [a] contract and objectively consider[] not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."  *In re NextMedia Group, Inc.*, 440 B.R. 76, 79 (Bankr. D. Del. 2010) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)) (internal quotation marks omitted).  Where the "ordinary meaning of the

contract language is clear and unequivocal, a party will be bound by its plain meaning." *Id.*; *see also Lorsch v. Goldin Assocs. LLC (In re Worldwide Direct, Inc.)*, No. 2010 WL 3435380, at *4 (Bankr. D. Del. Aug. 27, 2010) ("If a written contract is unambiguous on its face, the plain language of the contract is the exclusive source used for deriving a proper interpretation of the parties' intent.").

Here, the plain language is clear. The arbitration provision relates solely to the Co-Location Agreement and "any dispute between the parties in connection with [it]." (Co-Location Agreement § 12.8.) Nowhere in the arbitration clause or, more broadly, the Co-Location Agreement is there a reference to the Promissory Note or the Security Agreement that suggests that the arbitration clause in the former would encompass claims relating to the latter. Moreover, neither the Promissory Note nor the Security Agreement incorporate or reference section 12.8 of the Co-Location Agreement.

Relatedly, as Celsius notes, the terms of the Co-Location Agreement and Loan Documents suggest that the parties intended for the agreements to be governed under separate legal frameworks. As discussed above, the choice of law provision for the Loan Documents is New York law, in contrast to the Co-Location Agreement's choice of law of Delaware. (*Compare* Co-Location Agreement § 12.8 *with* Promissory Note at 11 (specifying New York law as governing law) *and* Security Agreement § 8.14 (indicating that sections 16, 17, and 18 of the Promissory Note, which, among other things, relate to governing law, are incorporated by reference *mutatis mutandis*).) Moreover, resolution of the claims under the Co-Location Agreement may be resolved without any interpretation or consideration of the Loan Documents as the agreements and the obligations arising under either are distinct. *See Lewis v. N.J. Sports Prods., Inc.*, No. 02-Civ-6505 (SAS), 2003 WL 1090279, at *3 (S.D.N.Y. Mar. 12, 2003)

(finding that the two agreements were not "inextricably related" because the disputes under each

could be resolved without addressing the other); *Bouriez v. Carnegie Mellon Univ.*, 359 F.3d

292, 295 (3d Cir. 2004) ("A dispute that arises under one agreement may be litigated

notwithstanding a mandatory arbitration clause in a second agreement, even where the two

agreements are closely intertwined.") (quoting *Indus. Elecs. Corp. v. iPower Distrib. Grp.*, 215

F.3d 677, 681 (7th Cir. 2000)).  The FAA "simply requires courts to enforce privately negotiated

agreements to arbitrate, like other contracts, in accordance with their terms."  *Volt Info.*, 489 U.S.

at 478.

Notably, the Promissory Note contains a provision that provides that "[t]his Note and the

other Note Documents constitute the entire contract between the parties with respect to the

subject matter hereof and supersede all previous agreements and understandings, oral or written,

with respect thereto."  (Promissory Note at 12.)  "Note Documents" is defined therein to refer to

the Promissory Note; the "Security Documents," including the Security Agreement; and "any

other document designated as such" by Celsius.  (*Id.* at 8.)  The Mawson Entities have not

indicated that Celsius designated the Co-Location Agreement to be a "Note Document."

Finally, in support of their contention that the Co-Location Agreement's arbitration

clause should be effectively "imported" into the Promissory Note and the Security Agreement,

the Mawson Entities rely on four cases.  (*See* Mawson Reply (citing to *Pitta v. Hotel Ass'n of

New York City, Inc.*, 806 F.2d 419 (2d Cir. 1986); *Douzinas v. Am. Bureau of Shipping, Inc.*, 888

A.2d 1146 (Del. Ch. 2006); *Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, No. 2021-0288-JTL,

2021 WL 3630298 (Del. Ch. Aug. 17, 2021); and *Prod. Res. Grp., LLC v. Martin Pro., A/S*, 907

F. Supp. 2d 401 (S.D.N.Y. 2012)).).  They argue that each of these cases stands for the

proposition that in a multi-contract situation where only one agreement contains an arbitration

clause, all disputes that arise under any of the agreements are arbitrable. The Court is unpersuaded.

In *Pitta*, the court's finding of arbitrability hinged on the fact that the agreement that lacked the arbitration clause was a supplement to an earlier "umbrella" agreement containing such a clause. *See Pitta*, 806 F.2d at 422–23. That is not the case here—the Co-Location Agreement, the Promissory Note, and the Security Agreement are three separate agreements and none "supplements" the other. The *Pitta* court further stated that even if the agreements were wholly distinct, the "broad language" of the arbitration clause would encompass the dispute. *Id.* at 423. The arbitration clause in question provided that "any acts, conduct or relations between the parties" would be subject to arbitration. *Id.* Here, the Co-Location Agreement's arbitration clause limits arbitration to disputes "in connection with [the Co-Location] Agreement." (Co-Location Agreement § 12.8.) Therefore, the *Pitta* case is inapplicable.

Similarly, the *Douzinas* case is also distinguishable. That case involved an arbitration clause that encompassed not only claims arising under the LLC agreement in question but also claims "related to" the agreement "whether arising in contract, tort or otherwise, and whether arising at law or in equity." *Douzinas*, 888 A.2d at 1150 (quoting the relevant LLC agreement) (quotation marks omitted). The *Douzinas* court concluded that claims were subject to the LLC agreement's arbitration clause since "[a]ny person adjudicating those claims would be required to interpret various provisions of the LLC Agreement in order to fairly determine the breadth and nature of fiduciary duties." *Id.* at 1152. Here, resolution of the claims arising under the Loan Documents does not require the Court to turn to the language of the Co-Location Agreement. The *Douzinas* case, therefore, also does not apply.

Finally, the *Flotek* and *Production Resources* cases, which were cited for their interpretation of the phrase "related to," interpreted such language solely within the context of forum selection clauses.  These cases are, therefore, also inapplicable.

Accordingly, the Co-Location Agreement's arbitration provision applies only to claims arising thereunder and cannot encompass Counts I, II, VI through VIII, and X, which relate to the Loan Documents.

**B.  The Claims Relating to the Loan Documents are Not Arbitrable**

As the arbitration provision encompasses solely the causes of action arising under the Co-Location Agreement, and the Loan Documents do not otherwise contain their own arbitration clauses, it is evident that the parties did not agree to arbitrate claims arising under the Promissory Note or the Security Agreement.  Despite favoring arbitration, the FAA "does not require the parties to arbitrate when they have not agreed to do so."  *Volt Info.*, 489 U.S. at 478.  Accordingly, Counts I, II, VI through VIII, and X, which relate to the Loan Documents, are not arbitrable.

**C.  The Remaining Claims Relating to the Co-Location Agreement Are Subject to Arbitration**

1.  Parties Have Agreed to Arbitrate Claims Arising Under the Co-Location Agreement

The plain language of section 12.8 of the Co-Location Agreement reflects that the parties agreed to arbitration.  As discussed, the provision provides that "[i]f there is any dispute between the parties in connection with [the Co-Location Agreement], including any question regarding its existence, validity or termination, unless amicably resolved by the parties, such dispute shall be finally settled by arbitration in accordance with the terms set forth hereunder."  (Co-Location Agreement § 12.8.)  Moreover, it further provides that each of the parties has "irrevocably and unconditionally . . . submit[ted] any dispute of any nature between the parties relating in any way

to this Agreement to arbitration as provided for above." (*Id.*)  Indeed, Celsius does not dispute

the existence of an agreement to arbitrate, nor does it dispute that Counts IV, V, and IX are

covered under the same, as discussed in greater detail below.  (*See, e.g.*, Celsius Opposition ¶ 45

("As a preliminary matter, Celsius does not dispute that [Counts IV, V, and IX] fall within the

scope of the arbitration clause").)  Rather, Celsius disputes whether all causes of action asserted

in the Complaint should be subject to arbitration pursuant to section 12.8 of the Co-Location

Agreement.

### 2.  The Scope of the Arbitration Clause is Broad

The scope of the arbitration clause in the Co-Location Agreement is broad, as it

encompasses "any dispute between the parties in connection with [the Co-Location Agreement]"

and "any dispute of any nature between the parties relating in any way to [the Co-Location

Agreement]."  (Co-Location Agreement § 12.8.)  Generally, clauses that "purport to refer all

disputes arising out of a contract to arbitration" are considered broad.  *MF Global*, 571 B.R. at

92 (quoting *Bethlehem Steel*, 390 B.R. at 790).  Here, the arbitration provision is clearly broad.

*See, e.g.*, *In re S.W. Bach & Co.*, 425 B.R. at 88 (concluding that a clause referring to arbitration

"any controversy or claim between [the parties] arising out of or relating to" an agreement will

be broad and justify a presumption of arbitrability); *MF Global*, 571 B.R. at 92 (concluding that

the provision, which covers "[a]ny and all disputes arising under or relating to this policy" is

"plainly broad").  Considering the foregoing, arbitrability will be presumed.

### 3.  Counts III, IV, V, and IX are Subject to Arbitration

#### a.  Counts IV, V, and IX Are Subject to Arbitration

Celsius concedes that, as a preliminary matter, that "[Counts IV, V, and IX] fall within

the scope of the arbitration clause."  (Celsius Objection ¶ 45.)  However, it asserts that the claims

are not automatically subject to arbitration since the claims, "totaling $15.3 million plus

unspecified amounts in lost revenue from Celsius's inability to operate its mining rigs, represent

important recoveries for the estate, are core, and should be adjudicated by this Court." (*Id.* ¶ 48.)

In support of this, Celsius centers on the timing of the claims and whether they constitute pre- or

post-petition claims. (*See id.* (asserting that Counts IV and V constitute post-petition claims

since Luna refused to remit the $15.3 million in unused deposits in August 2023, and Count IX is

a mixed pre-petition and post-petition claim with breaches commencing in April 2022 and

continuing post-petition).) Celsius's arguments are unpersuasive.

As discussed above,

> A proceeding that involves rights created by bankruptcy law, or that could
> arise only in a bankruptcy case, is a core proceeding . . . . A claim is non-
> core if it 'does not depend on bankruptcy laws for its existence . . . and could
> proceed in a court that lacks federal bankruptcy jurisdiction.'

*In re Residential Cap., LLC*, No. 14-cv-4950, 2014 WL 4652664, at *2 (S.D.N.Y. Sept. 10,

2014) ("*Residential Capital*") (quoting *DeWitt Rehabilitation & Nursing Center, Inc. v.*

*Columbia Cas. Co.*, 464 B.R. 587, 591 (S.D.N.Y. 2012)). Additionally, "[w]hether a contract

action is a core proceeding or a non-core proceeding also requires consideration of '(1) whether

the contract is antecedent to the reorganization petition; and (2) the degree to which the

proceeding is independent of the reorganization.'" *Residential Capital*, 2014 WL 4652664, at

*2.

Counts IV, V, and IX are non-core. It is undisputed that the Co-Location Agreement was

entered into pre-petition on February 23, 2022.[4] Moreover, resolution of these claims possesses

a sufficient degree of independence from Celsius's confirmed bankruptcy case. Indeed, the

causes of action involve only state law contract claims and do not otherwise invoke rights under

the Bankruptcy Code. *See id.* (deeming a dispute involving a pre-petition contract involving

---

[4]     Celsius's petition date is July 13, 2022.

state law contract claims that did not otherwise invoke rights under the Bankruptcy Code to be non-core). This Court has previously recognized that simply because a dispute involves potential estate assets does not render it "core." *See MF Global*, 571 B.R. at 95 (rejecting the argument the collection and administration of a $15 million insurance policy would, by itself, render a dispute core). Here, the $15.3 million in unused deposits does not constitute the most important asset of Celsius's estate, nor is it the sole source of recovery for any creditor group. *See id.* (concluding similarly regarding an insurance policy and deeming the dispute over it non-core).

In support of the assertion that the pre- and post-petition distinction is relevant to the Court's analysis, Celsius cites to *In re D&B Swine Farms, Inc.*, 430 B.R. 737 (Bankr. E.D.N.C. 2010) where the bankruptcy court held that a post-petition breach of a pre-petition contract constituted a core matter within its jurisdiction. However, Celsius fails to note that court's determination was predicated on its finding that "any monies the debtor may recover in the proceeding are not only the assets of the chapter 11 estate [but] also are the *only* assets of the estate." *D&B Swine Farms*, 430 B.R. at 743 (emphasis in original). Accordingly, the court's determination of core or non-core still rested on an evaluation of the impact on the bankruptcy estate as opposed to the timing of the alleged breaches. Here, while recovery of the $15.3 million in deposits would "surely augment the estate . . . in the scheme of this large chapter 11 case, the collection and administration of this amount does not by itself render this dispute core." *MF Global*, 571 B.R. at 95.

Rather, the claims here are "based on the parties' pre-petition relationship" and are not based on any "rights created under the Bankruptcy Code." *Hagerstown*, 277 B.R. at 203. Sending these claims to arbitration would not conflict with bankruptcy policy. *Id.* at 201 (indicating that a non-core matter "is unlikely to present a conflict sufficient to override by

implication the presumption in favor of arbitration") (citation omitted).  As the federal policy of favoring arbitration agreements outweighs "federal interests embodied in the Bankruptcy Code," Counts IV, V, and IX should be sent to arbitration pursuant to section 12.8 of the Co-Location Agreement.

Note that, with respect to Counts IV and V specifically, Celsius argues that they constitute post-petition claims because Luna refused to remit the $15.3 million in unused deposits at the termination of the Co-Location Agreement in August 2023.  Celsius cites no language in the Co-Location Agreement that sets forth this "obligation" and instead, refers to solely to an email from a Lauren Schmidt, a finance manager at Mawson, who indicated to Jenny Fan, an individual at Celsius, that Luna would "refund the full deposit amount at the end of the contract."  (Complaint ¶ 36; *id.*, Ex. N (copy of the Lauren Schmidt email).)  There is no indication or argument that this email was intended to be incorporated as part of the Co-Location Agreement.  Celsius also cites to "[i]nternal discussions between Mawson employees [that] further demonstrate an understanding that Luna was obligated to return any unused deposit amounts to Celsius at the end of the Co-Location Agreement."  (*Id.* ¶ 36.)  Section 2.8 of the Co-Location Agreement, which concerns the "effect of termination," states only that upon the expiration or termination of the Co-Location Agreement, Luna will provide "an invoice setting out all outstanding charges up to the date of the termination, less any credits for amounts held as a deposit."  (Co-Location Agreement § 2.8.)  It does not indicate that unused deposits must be returned to Celsius.

### b.  Count III is Subject to Arbitration

Count III seeks the return of the $15.3 million in unused deposit amounts on grounds of turnover under section 542(b) of the Bankruptcy Code and is also subject to arbitration.  Section 542(b) provides:

> [A]n entity that owes a debt that is property of the estate and that is *matured, payable on demand, or payable on order*, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C. § 542(b) (emphasis added).

Generally, a debt is considered "matured or payable on demand" if it is one that is "presently payable, as opposed to [one] that [is] contingent and become[s] payable only upon the occurrence of a certain act or event.'" *Sec. Investor Prot. Corp. v. Rossi (In re Cambridge Cap., LLC)*, 331 B.R. 47, 57 (Bankr. E.D.N.Y. 2005) (alterations in original) (citation and internal quotation marks omitted); 5 COLLIER ON BANKRUPTCY ¶ 542.04 (16th 2023) (stating the same). The focus of a court's analysis, then, is whether a debt is "matured."

Generally, a debt is considered "matured" if it is "specific in its terms as to amount due and date payable." *Tese–Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 67 (Bankr. S.D.N.Y. 2004) (citing *Shea & Gould v. Red Apple Cos. (In re Shea & Gould)*, 198 B.R. 861, 867 (Bankr. S.D.N.Y. 1996)); *see also Kenston Mgmt. Co. v. Lisa Realty Co. (In re Kenston Mgmt. Co.)*, 137 B.R. 100, 107–08 (Bankr. E.D.N.Y. 1992) ("[F]or an action to be a turnover proceeding, it is not relevant that [all] the defendant[s] dispute the existence of the debt by, perhaps, denying the complaint's allegations, as long as these allegations state the existence of a mature debt.") (alterations in original) (citation and internal quotation marks omitted).

That is not the case here. Relief for Count III necessitates, as a threshold matter, a determination of whether Luna breached the Co-Location Agreement (*i.e.*, resolution of Count IV), which would give rise to a "matured" debt thereunder. "It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute." *Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.)*, 198 B.R. 45, 50 n.7 (S.D.N.Y. 1996) (quoting *U.S. v. Inslaw, Inc.*, 932 F.2d

1467, 1472 (D.C. Cir. 1991)).  Specifically, resolution of Count III, as with Count IV, requires a

determination of whether Luna was obligated to return the unused deposits to Celsius upon the

Co-Location Agreement's termination on August 23, 2023, which, as noted above, is unclear

from the language of the Co-Location Agreement itself and is, therefore, subject to dispute.  As

the debt is not "matured," Count III cannot be a claim for turnover under section 542(b) of the

Bankruptcy Code, and is therefore arbitrable.

### D.  No Dismissal or Stay Pending Arbitration is Needed

As resolution of claims arising under the Co-Location Agreement is distinct and

independent from the resolution of claims arising under the Loan Documents, no dismissal or

stay pending arbitration is needed.  There is no risk of inconsistent results or common questions

of fact and, as noted, the agreements are distinct and operate under different legal frameworks.

### III.   CONCLUSION

Accordingly, the Court **GRANTS** the Motion with respect to Counts III, IV, V, and IX

and **DENIES** the Motion with respect to Counts I, II, VI through VIII, and X.  Counts I, II, VI

through VIII, and X—all of which arise under the Loan Documents—shall not be stayed pending

outcome of the arbitration.

Defendants shall file their answers to Counts I, II, VI through VIII, and X of the

Complaint within thirty (30) days after the date of this Opinion.

Dated:     February 27, 2024
           New York, New York

                             *Martin Glenn*
                          _____
                             MARTIN GLENN
                       Chief United States Bankruptcy Judge